[APRIL TERM, 1926]

## PHIFER v. BAKER*
### (No. 1191; April 5, 1926; 244 Pac. 637.)

PHYSICIANS AND SURGEONS—PLEADING—NEGLIGENCE CAUSING DE-
FORMITY — EVIDENCE — MALPRACTICE — HYPOTHETICAL QUESTION—
TRIAL—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE—APPEAL AND
ERROR—DAMAGES—REFUSAL OF INSTRUCTIONS.

1. Petition alleging that surgeon's careless and unskilled
   bandaging of plaintiff's fractured arm, and permitting
   it to remain bandaged without readjustment for 10 days,
   caused arm to become permanently deformed, *held* to
   charge negligence in bandaging it too tightly at first
   treatment as well as leaving it too tight thereafter.

2. Evidence that surgeon's negligent bandaging of splints
   on fractured ulna of forearm too tightly, and failure
   to remove bandages and inspect arm at proper time,
   caused·deformity of arm, *held* sufficient to go to jury.

3. Surgeon is not liable for mere error of judgment, if he
   makes careful examination and exercises ordinary care
   and skill.

4. Omission from hypothetical question, propounded to med-
   ical experts in malpractice action, of fact that when
   alleged tightness of bandages.on fractured arm, claimed
   to have caused deformity, was called to attention of nurse
   and defendant surgeon, they made immediate examina-
   tion of splints and felt of plaintiff's hand, and that
   X-ray examination was made before fracture was treated,
   *held* not to make question unfair.

5. Hypothetical question, propounded to medical experts in
   action for negligent treatment of fractured arm, which
   assumed fixing of splints thereon with tight bandages,
   pronounced discoloration of fingers, with marked swelling,
   and that hand turned cold within 30 minutes, *held* not
   unfair or misleading because of use of words "pro-
   nounced," "marked," "developed," and "turned cold,"
   because such words were not in evidence.

6. Instruction in malpractice action that defendant claims
   that injury resulted from negligence of plaintiff and

her parents rather than negligence of defendant, though objectionable as ignoring defendant's denial of any negligence, was not prejudicial, where other instructions clearly brought out such denial.

7. Instruction that plaintiff was seeking damages for surgeon's alleged negligence in bandaging her arm and in failing to remove bandages *held* not objectionable for omitting issue whether defendant refused to make examination to determine necessity for removing bandages, where petition alleged negligence in bandaging arm and in failing to remove bandages.

8. Giving of instruction defining negligence generally, though unnecessary in malpractice action, wherein rules governing civil liability of physicians and surgeons were given, *held* not prejudicial.

9. Instruction in malpractice action, stating rule of ordinary care required of physicians and surgeons, was not objectionable for failing to limit it to care and skill possessed by surgeons in community or similar communities, where preceding instruction contained such limitation, and jury was instructed to consider instructions as a whole.

10. Instruction in malpractice case, that if deformity was caused by surgeon's negligence, subsequent negligent treatment or care by others would not bar recovery, but could be considered in mitigation of damages if it aggravated injury, *held* not objectionable as inapplicable, where evidence showed that any negligence of plaintiff or her parents occurred long after acts of negligence charged against surgeon.

11. Instruction that law presumes that a child between 7 and 14 cannot be contributorily negligent should not be given in malpractice case, unless child was wholly under care of surgeon, charged with duty of care ordinarily resting on parents.

12. Error in giving instruction in malpractice action that law presumes that child between 7 and 14 cannot be contributorily negligent *held* not prejudicial, where there was no evidence that negligence of child after surgeon's treatment of fractured arm caused deformity.

13. In action against surgeon for negligence in treating fractured arm, instruction that plaintiff's recovery is not limited to pecuniary loss directly proved, but that certain results must be left to jury's discretion to award reasonable

compensation justified by circumstances and evidence, *held* not objectionable.

14. Damages recoverable by nine year old girl for surgeon's negligent treatment of fractured arm are reasonable compensation for injury caused thereby, taking into account any pain and suffering, physical and mental, resulting therefrom, and which she will suffer in future, and diminished chances of marriage resulting from deformity, exclusive of pain and suffering from original injury and aggravation thereof caused by others than defendant.

15. Instruction as to measure of damages for surgeon's malpractice, stating that amount awarded plaintiff shall not exceed amount prayed for in petition, *held* not prejudicial to defendant, where verdict was only for half the amount prayed for.

16. Refusal of requested instructions was not error where instructions given sufficiently covered matters involved.

*See Headnotes (1) 30 Cyc. p. 1583 n. 38. (2) 30 Cyc. p. 1588 n. 83. (3) 30 Cyc. p. 1578 n. 91, 92. (4) 22 C. J. p. 711 n. 78, 79; p. 713 n. 95. (5) 22 C. J. p. 710 n. 67; p. 713 n. 95. (6) 38 Cyc. p. 1785 n. 90. (7) 30 Cyc. p. 1590 n. 96. (8) 4 C. J. p. 1033 n. 37. (9) 38 Cyc. p. 1778 n. 73; p. 1779 n. 75, 76. (10) 30 Cyc. p. 1590 n. 94. (11) 30 Cyc. p. 1589 n. 92. (12) 4 C. J. p. 1029 n. 30. (13) 30 Cyc. p. 1590 n. 97 New. (14, 15) 4 C. J. p. 1043 n. 45;; 17 C. J. p. 843 n. 19: 30 Cyc. p. 1590 n. 97 New, 2, 3; p. 1591 n. 5, 8. (16) 4 C. J. p. 1172 n. 62: 38 Cyc. 1711 n. 19.

ERROR to District Court, Converse County; CYRUS O. BROWN, Judge.

Action by Myrtle Baker, by Harry J. Baker, her next friend, against Fred W. Phifer, to recover damages for alleged malpractice. There was judgment for plaintiff and defendant brings error.

*O. O. Natwick, Joseph Garst,* and *Corthell, McCollough & Corthell,* for plaintiff in error.

The evidence was insufficient to sustain the verdict; the court erred in giving and refusing instructions and in the admission and rejection of evidence; defendant was entitled to a directed verdict; the only negligence alleged, or attempted to be proven, was defendant's refusal to loosen

bandages alleged to be too tight; where a specific act is charged as negligence, proof of general negligence is not admissible; O'Grady v. Cadwallader, (Ia.) 166 N. W. 755; Ennis v. Banks, (Wash.) 152 Pac. 1037; Smith v. Mammen, 164 Ill. App. 176; Kirby's Admr. v. Berea College, (Ky.) 244 S. W. 775; the law requires physicians to possess a degree of skill equal to the average member of the profession and to apply ordinary and reasonable care; Wilson v. Blair, (Mont.) 211 Pac. 289; he is not an insurer of a cure; Martin v. Courtney, (Minn.) 77 N. W. 813; proper skill and care are presumed; Angulo v. Hollar, (Md.) 112 Atl. 179; State v. Housekeeper, (Md.) 16 Atl. 382; Fincher v. Davis, (Ga.) 108 S. E. 905; this court is not concluded by mere formal assertions, but will look to the legal significance of evidence; Fieldhouse v. Leisburg, 15 Wyo. 207; Weidenhoft v. Primm, 16 Wyo. 340; Wolbol v. Steinhoff, 25 Wyo. 251; testimony of other physicians as to whether or not they would have removed the bandages is not proof of negligence on part of defendant; Browning v. Hoffman, 111 S. E. 492; Leighton v. Sargent, 27 N. H. 460; De Bruine v. Voskuil, (Wis.) 169 N. W. 288; Schumacher v. Hospital, (Mont.) 193 Pac. 397; Scherer v. Eidenmuller (Calif. App.) 187 Pac. 445; an honest mistake is not negligence; Browning v. Hoffman, Supra; malpractice cases call for expert testimony only; Norkett v. Martin, (Colo.) 165 Pac. 256; Miller v. Toles, (Mich.) 150 N. W. 118; 4 Wigmore Ev., 2090; DeLong v. Delaney, 206 Pa. St. 226; Ewing v. Goode, 78 Fed. 442; hypothetical questions must fairly present the essential facts otherwise it is of no probative value; Nichols v. R. R. Co., (Utah.) 70 Pac. 996; Wittenberg v. Onsgard, (Minn.) 81 N. W. 15; Taylor v. McClintock (Ark.) 112 S. W. 405; Opp. v. Pryor, (Ill.) 138 N. E. 580; Barbers Estate, (Conn.) 27 Atl. 973; the hypothetical question propounded in this case was incomplete and contained phrases of uncertain meaning; the question imported a sequence of events following the operation, not

brought out in the testimony, and was erroneous; Farrell v. Haze, (Mich.) 132 N. W. 197; defendant's evidence was corroborated and much of it uncontradicted; it was of a conclusive character. The evidence of the plaintiff is self-contradictory and inherently incredible on the material points on which the plaintiff's claim depends; the verdict is unjust and not supported by the evidence. Staloch v. Holm, (Minn.) 111 N. W. 264; Paulich v. Nipple, (Kan.) 180 Pac. 771; Richards v. Willard, 176 Pa. St. 181; 35 Atl. 114; Willard v. Norcross (Vt.) 85 Atl. 904; Bush v. Chilcott, (Mont.) 215 Pac. 1001; Farrell v. Haze, Supra; Booth v. Andrus, (Nebr.) 137 N. W. 884; Snearly v. McCarthy, (Ia.) 161 N. W. 108; instructions on issues not raised by the evidence, or opposed to the evidence, are erroneous; 38 Cyc 1618; issues should be stated in instructions; Wallace v. Skinner, 15 Wyo. 243; facts established by the evidence should be so considered in the charge; Kahn v. Insurance Co., 4 Wyo. 419; instructions numbered 1 and 2 are erroneous; Staloch v. Holm, Supra; instructions numbered 4, 5 and 6 are erroneous; Hibbard v. Thompson, 109 Mass. 286; instruction number 10 contradicts instruction number 9; Merrill v. Odiorne, (Me.) 94 Atl. 753; in malpractice cases, mutual negligence defeats recovery, as a general rule; Lower v. Franks, (Ind.) 17 N. E. 630; Whitesell v. Hill, (Ia.) 66 N. W. 894; Baker v. Janinski, 15 N. Y. S. 675; Young v. Mason, 35 N. E. 521; various phases of contributory negligence arose in the following cases: Potter v. Warner, 91 Pa. St. 362; Summers v. Tarpley (Mo.) 208 S. W. 266: McGrew v. Kerr, (Colo.) 128 Pac. 873; Browning v. Hoffman, Supra; Moss v. Richworth, (Tex.) 222 S. W. 225; the foregoing cases emphasize the objectionable character of instruction number 10; instructions numbered 12 and 13, dealing with the measure of damages, are erroneous; U. P. R. R. Co. v. Hause, 1 Wyo. 27; Yaunt v. Strickland, 17 Wyo. 526; Bush v. Chilcott, Supra; to entitle plaintiff to recover damages for appre-

hended consequences, there must be such a degree of probability of there occurring as amount to a reasonable certainty; Chicago R. R. v. Henry, 62 Ill. 142; Ohio R. R. Co. v. Cosby, (Ind.) 7 N. E. 373; annoyance caused by contemplation of disfigurement, is too remote to be considered an element of damage; Giffin v. Lewiston, (Ida.) 55 Pac. 545; R. R. Co. v. Caulfield, 63 Fed. 396; R. R. Co. v. Dickens, (Tex.) 118 S. W. 612; diminished chances of marriage were neither alleged nor proven; 3 Sedgwick, 1270; loss of time is another special form requiring pleading and proof; Staal v. R. R. Co. 13 N. E. 624; general damages are such as result from the wrong complained of, being natural but not the necessary result of such wrong; Henderson v. Co., 19 Wyo. 183; the court improperly refused instructions requested by defendant; errors in the admission or rejection of evidence, prejudicial to defendant, are presented by the record; they relate, among other things, to demands by defendant for payment, conduct of plaintiff's parents, hypothetical questions and the removal of plaintiff from defendant's hospital.

*Reid & More, J. E. Jacobson,* and *Maurer & Walker,* for defendant in error.

The petition charges negligence resulting in deformity and other injurious consequences to plaintiff's arm and thus states a cause of action; 3 C. J. 725; 29 Cyc. 569; pleadings are liberally construed; 5686 C. S.; David v. Whitehead, (Wyo.) 79 Pac. 19; the evidence sustained the verdict; Dutro v. R. R. Co., (Mo.) 86 S. W. 915; 15 L. R. A. N. S. 416; medical experts may give their opinions as to probable results; Roark v. Greeno, (Kan.) 59 Pac. 655; proprietors of private hospitals, conducted for profit, are liable for negligent acts of employees; Fawcett v. Ryder, 135 N. W. 800; hypothetical questions, within the probable range of the evidence, are permissible; Lawson Ev. 152; Courvoisier v. Raymond, (Colo.) 47 Pac. 284; in re Barber's Estate, 27 Atl. 973; general objections to

such questions are insufficient; Knight v. Co., 54 N. E. 890; defendant's evidence was not conclusive as contended in his brief; a jury so found and the finding is conclusive on appeal; Harden v. Card, 15 Wyo. 217; 17 Wyo. 526; Henderson v. Coleman, 19 Wyo. 183; the case was properly submitted to the jury; 27 Cyc. 627; Raush v. Smedley, (Pa.) 57 Atl. 359; 29 Cyc. 630-32; where an amendment might have cured a variance, judgment will not be disturbed; Kuhn v. McKay, 7 Wyo. 42; Rohrbaugh v. Mokler, 188 Pac. 448; a physician must inform himself sufficiently to permit the exercise of a reasonable judgment; 30 Cyc. 1578; a preponderance of evidence is sufficient in malpractice cases; Shockley v. Tucker, (Ia.) 103 N. W. 360; Hickerson v. Neely, (Ky.) 54 S. W. 842; Moratzky v. Wirth, (Minn.) 69 N. W. 480. Nichols v. R. R. Co., 70 Pac. 996; cited by plaintiff, is not in point on the facts; the same is true of Taylor v. McClintock, 112 S. W. 405, Opp v. Pryor, 138 N. E. 580, and People v. Vanderhoff, (Mich.) 39 N. W. 28; instructions must be considered together; Bunce v. McMahon, 6 Wyo. 24; an examination of the instructions given will show that they were proper and that the case was fairly submitted to the jury on the law; negligence on the part of defendant having once been established in a malpractice case, a recovery for damages will not be defeated by proof of supervening or subsequent negligence on the part of the patient, or those in charge of the patient, as that will merely operate in mitigation of damages; Schultz v. Tusch, (Wis.) 165 N. W. 62; Sauers v. Smitts, (Wash.) 95 Pac. 1097; Carpenter v. Blake, 75 N. Y. 12; Sanderson v. Holland, 39 Mo. App. 233; deformity, diminished chances of marriage and loss of earning power, are general damages; Henderson v. Coleman, Supra; 17 C. J. 870; Smith v. R. R. Co., 90 Fed. 783; Caldwell Co. v. Hollister, (Okla.) 224 Pac. 966.

POTTER, Chief Justice.

Myrtle Baker, by Harry J. Baker, her father, as next friend, brought this action against the defendant, Fred W. Phifer, to recover damages for alleged malpractice as a physician and surgeon. A jury trial resulted in a verdict for the plaintiff upon all of the issues and assessing the damages in the sum of $10,000. The case is here on error for a review of the judgment rendered upon that verdict.

The material averments of the petition are: That the defendant is a practicing physician and surgeon located at Wheatland. That on the early evening of July 2, 1921, the plaintiff sustained a fracture of her left arm between the wrist and elbow, a simple break, "the skin not being broken;" that she was immediately taken to the defendant, to "examine, heal, properly set, adjust and treat said fracture," for a reasonable compensation; that the defendant on the same evening set the broken bone and applied splints to the arm. That in bandaging the arm defendant did not make sufficient allowance for the swelling invariably attendant upon fractured limbs, as a consequence of which, within about thirty minutes after said splints were applied, the arm was subjected to undue pressure therefrom by reason of the swelling of the arm, the arm became black and blue, the fingers became discolored and cold from lack of circulation, and the plaintiff was subjected to intense pain and suffering which continued until the bandages were finally removed some nine or ten days later; that defendant was notified of the pain and begged by plaintiff and her mother to take off or loosen the bandages, but that defendant negligently, carelessly, and unskillfully refused to remove or loosen them or to make an examination to determine the necessity therefor, and administered opiates to deaden the pain; that at frequent intervals thereafter during the entire ten-day period, defendant was requested to remove or loosen said bandages, but that he at all times negligently, carelessly

and unskillfully refused to remove or loosen the same and the said bandages continued in the original tight condition for the entire period of ten days. That as a result of said pressure, when defendant did finally remove said bandages after ten days time "the circulation of blood through said arm had been impaired, resulting in necrosis of the skin and ulceration of the skin, flesh and tendons on both side of said arm immediately underneath the entire length of the splints and extending down into the wrist; that by reason of said careless and unskillful manner of bandaging said splints upon the arm and permitting them to remain thereon without readjustment for said period of ten days, and the necrosis and ulceration caused thereby, the muscles and tendons of said arm have contracted and said arm has become permanently deformed and the left hand of plaintiff is now useless and plaintiff will not in the future recover the normal use of said arm and hand, the injury being permanent. That defendant in his treatment did not exercise that degree of skill and care ordinarily exercised by members of his profession practicing in that and other localities, and that the pain and suffering incurred by plaintiff and the deformed condition of her arm and hand were caused solely by the "negligence, carelessness and unskillfulness of the defendant in the treatment of said arm above described." That as a result thereof plaintiff suffered excruciating pain and agony for a period of several weeks, and has suffered a permanent injury which will continue through her life and will "cause her shame, humiliation and mental suffering from contemplation of her disfigured condition, which will further operate to destroy her chances of marriage and the enjoyment of the normal life and happiness." That as a further result she will be maimed and disabled for the rest of her natural life, will be hampered and hindered in the performance of the simplest household tasks, and will be physically disabled from earning

her own living. Damages are prayed in the sum of $20,-000.

The answer admits that plaintiff is a minor, nine years of age; that defendant was "and still is" a practicing physician and surgeon located at Wheatland, Wyoming; and on information and belief admits that on or about July 2, 1921, at or about 6:00 p. m., plaintiff sustained a fracture of her left arm between the wrist and elbow; but alleges that it was a compound fracture, and that the skin was broken; and on information and belief admits that plaintiff was immediately taken to the defendant, to examine and treat said fracture for a reasonable compensation. That about 7:30 p. m. on the same day he set the broken bone and applied splints to the arm and that the plaintiff in consequence of said fracture was subjected to intense pain and suffering; that the defendant administered sedatives to relieve the pain, and that said arm has become deformed. Each and every other allegation of the petition is denied. For a second defense it is alleged that plaintiff's pain and injury were directly caused by the negligence of the plaintiff, and her failure and refusal to obey or observe the reasonable and proper requests and instructions of defendant, and in particular by her failure and refusal to remain in the hospital and in defendant's care for a sufficient time to properly treat the arm, and by her negligent, unskillful and wrongful acts in interfering with and obstructing defendant's treatment, and in tampering with the bandages, and in other diverse ways and means in failing and neglecting to bestow upon herself the proper care and after treatment, and in subjecting the arm to undue strain, relaxation and in exposing the same to infection and other complications, "all of which wrongful and negligent acts, directly and in great part caused and contributed to the injury." By a third defense it is alleged that the plaintiff's injury and pain was caused by the negligence of plaintiff's father and mother, her natural guardians, and in whose custody

she was, in *their* failure and refusal to obey reasonable and proper requests and instructions and *their* failure and refusal to permit plaintiff to remain in the hospital and in defendant's care and in interfering with and obstructing the treatment and in tampering with the bandages, etc.

A reply was filed, denying separately as to each of said defenses each and every material allegation thereof save and except such as may have been, in plaintiff's petition, specifically alleged or admitted to be true.

The brief of plaintiff in error groups the questions presented to this court under three heads: First, the sufficiency of the evidence to sustain the verdict; Second, the giving and refusal of instructions; Third, the admission or rejection of evidence. And the first question discussed in that brief, and the same order is followed in the opposing brief, is the sufficiency of the evidence. That question is presented by assignments of error complaining of the rulings of the court in denying defendant's motion for a directed verdict at the close of plaintiff's evidence, denying a peremptory instruction upon the final submission of the case, and denying the motion for a new trial embracing grounds that the verdict is not sustained by sufficient evidence and is contrary to law, and that the court erred in refusing a peremptory instruction.

Following, generally, the same order of discussion, it will be necessary to consider, first, the alleged error in overruling the motion for a directed verdict at the close of plaintiff's evidence. But a preliminary question must first be disposed of. There is a conflict not only in the pleadings with reference to the nature of the plaintiff's injury and defendant's treatment thereof, but also a conflict in the evidence respecting those matters. Counsel disagree also as to the purport and effect of the averments of the petition charging negligence. And the argument upon the question of the sufficiency of the evidence is based, to a considerable extent, upon the respective views

of counsel concerning the effect of the petition in the respect indicated.

Counsel for plaintiff in error insist that the precise ground of complaint stated in the petition is that defendant negligently, carelessly and unskillfully refused to remove the bandage from the arm or to make an examination to determine the necessity therefor, and that while it is averred that the defendant, in applying the splints and bandages, did not make sufficient allowance for swelling, and in consequence thereof the arm was subjected to undue pressure, *negligence* is not predicated upon those acts, but *solely* upon the refusal to loosen the bandage or to make an examination thereof when requested. It is contended by opposing counsel that negligence in bandaging the arm too tightly in the first instance is expressly alleged and that damage resulting therefrom is also alleged. They call attention to the averment that by reason of the careless and unskillful manner of bandaging the broken arm, and permitting the same to remain thereon without readjustment for said period of ten days, and the necrosis and ulceration caused thereby, the muscles and tendons of said arm have contracted and said arm has become permanently deformed, etc. And they argue that in the motion for a new trial it is stated as one of the grounds therefor that plaintiff seeks to recover damages *for alleged negligence in bandaging her broken arm too tightly* and keeping this bandage too tightly applied without proper care to discover that condition of the bandages, thereby showing the understanding of defendant's counsel at the trial as to the grounds of negligence. And further, that defendant's counsel, when interposing certain objections to testimony stated as the ground thereof in one instance ''that the charge here is that this was negligence in putting these bandages on,'' and in another that ''the only charge of negligence is in putting on the original bandage.'' Whether or not such statements of counsel for defendant below might be accepted here as sufficient to

hold the defendant bound by the position indicated thereby, or persuasive as to counsel's understanding of the averments of negligence, we are not inclined to base our decision concerning the matter upon any such ground. We have carefully examined the several averments relating to the matter, which are all quoted above in reciting the pleadings, and we are led thereby to the conclusion that the petition is to be regarded as plainly charging negligence in the bandaging of the arm too tightly at the time of the first treatment, as well as leaving it too tight thereafter and refusing to loosen the same.

In Priestly v. Stafford, 30 Cal. App. 523, 158 Pac. 776, the findings of the trial court, set out in the opinion, described the manner of applying splints and bandage to an injured arm and the failure to loosen the same in substantially the same language as in the petition here; so much the same, indeed, as to bring from defendant's counsel the comment that the case would appear to have been taken as a model for the averments in this case. The case appears to have been much like the case at bar, but we refer to it at this point to show that such findings were held to include negligence not only in failing to loosen the splints and bandage but also in originally adjusting the same too tightly.

The examination and treatment of the plaintiff by defendant occurred at the Wheatland hospital, of which institution he was in charge, and which was owned by his wife and himself. The plaintiff was taken there immediately after her accident by her father and mother, accompanied by a Mr. Beal, the father's cousin. Upon a casual examination the defendant declared that he thought the arm was broken, and she was taken to the X-ray room, where, in the presence of those above named and a nurse or two the arm was examined through a fluoroscope, and an X-ray picture taken of it. Plaintiff was then taken to the operating or dressing room, where, in the presence of two nurses and Mr. Beal, the child being under an anaes-

thetic, defendant set the arm and applied splints and bandage. Mr. Beal's testimony, the only one of plaintiff's witnesses who was present, describes that operation or treatment substantially as follows:

That she was put on a little dressing table and Dr. Phifer set the arm and bandaged it, using two splints not quite as wide as the arm ''as near as I can remember.'' Asked whether any padding was used under the splints, he said that there was a little cotton. That the bandage then put on was between two and three inches wide, and was wrapped ''tightly,'' explaining why he thought so by saying ''he (the doctor) pulled on them when he wrapped them,'' and that the doctor then commented: ''the mother will think those bandages are too tight, but they they are not, they are all right.'' Asked about how far the splints came down the arm, he said that the splint on the inside came down clear to the fingers, as near as he could remember. He testified also, as did the plaintiff, and both her father and mother, that there was no rupture of the skin of the arm at any place.

After that operation plaintiff was given a bed at the hospital, and remained at the hospital at that time for five days. Her witnesses agree in their testimony that within a short time after the treatment aforesaid, the same evening, the fingers of the hand became cold and blue, and curled over the ends of the splints: that when the attention of a nurse was called to it she looked at and felt of it, but declared it to be all right; that the attention of other nurses was called to the condition during said five days; and on the next morning (Sunday) the father mentioned the condition and the tightness of the bandage to the defendant. On the fifth day plaintiff was taken from the hospital by her mother to their home at Guernsey, about thirty miles away. There is a direct conflict in the testimony as to whether that was done with the consent of defendant or not, and also as to whether during said period

of five days the splints and bandage had been either re-
moved or loosened. The mother testified that no change
was made in that respect during that time, basing that
upon her knowledge of the appearance of the bandages
each day. Nor was there any removal or loosening thereof
until plaintiff was returned to the hospital on the tenth
day after the first treatment, so far as plaintiff's evidence
shows. On that day the bandages were removed, as plain-
tiff and her witnesses testified. She testified about the
matter as follows. That when she woke up her arm had
boards on both sides of it, and the boards were wrapped
tightly around with cloth, and that neither the boards nor
cloth was taken off while she was at the hospital that time.
"Q. Where did you go from the hospital? A. Well, after
a long time we went home. Q. And did you go back to the
hospital again? A. Yes. Q. Were your bandages taken
off while you were at home that time? A. No, they
weren't. Q. When were these bandages taken off, do you
remember? A. After we went back to the hospital. Q.
Did they put you to sleep when they took the bandages
and splints off your arm? A. No. Q. Did you see your
arm then after the bandages and splints were taken off?
A. Yes. Q. Can you remember how it looked? A. Yes.
It was mashed flat, and there were sores up and down the
back here and the front, and the bloody water was drop-
ping out. Q. How long was it before these sores healed
up? A. I don't remember myself, but it was a long time.
Q. And who treated that arm, who dressed that arm while
they were getting well? A. Well, Dr. Holtz (Dr. Phifer's
assistant) was trying to get them healed up. Q. And did
anyone else take care of it before it was well? A. Yes, Dr.
Lowe. Q. Can you use that arm now? A. No. Q. Will
you hold your arm out, please, and show the jury how
much you can move those fingers? Can you lift anything
with that hand? A. No, not much. Q. Can you straight-
en that wrist out? A. No. Q. Let us see how far you can

straighten it. Now can you straighten those fingers out? (Witness indicating) That far? A. Yes. Q. Why do you hold your thumb in against your hand that way? A. Because I can't move it out. Q. Is it that way all the time? A. Yes. Q. When you fell down, that afternoon, and broke your arm, did your arm bleed? A. No. Q. Were there any cuts or scratches on it? A. No."

It appears that after that, the mother took the child to the hospital for treatment from time to time, during which period following a treatment of several weeks after the removal of the bandages, a second operation was performed. We quote a part of plaintiff's testimony concerning that, for she seems to be the only witness on her side of the case testifying particularly about it. It appears first in her cross-examination:

"Q. You said Dr. Phifer put you to sleep and set your arm,—You supposed he set it? A. Yes. Q. Did he put you to sleep more than once in the hospital? A. The first time? Q. Any time while you were there? A. Yes. Q. When was the other time? A. It was a long time after that. I don't know how long. It was one time that I stayed there, but I don't know which time it was. Q. Do you know what he did while you were asleep? A. He put a drain from here to here (indicating). Q. He cut into your arm and drained it, did he? A. I don't know what he did, but anyway I remember I had a little gauze through there. Q. Inside of the flesh, was it? A. Yes. Q. And was your arm sore there? A. Yes. Q. You spoke about this sore arm a little while ago. Where were the sores on your arm? A. Well, they were from here, from down there on this side up to there, and on this side from here up to here (indicating). Q. All the way up on the inside of the arm and on the outside of the arm? A. Yes."

Mrs. Baker testified concerning the tightness of the bandage, the condition of the arm during the first ten days, and when the bandage was remvoed:

"I felt of the bandage and it seemed awful tight, and her fingers were blue, and curled over the ends of the splints— * * * * Mr. Baker told the nurse the bandages were too tight, and the nurse felt the fingers and said No, it was all right. The next day the hand was still blue and swollen clear up, and stiff and cold. * * * I asked Dr. Phifer if I could take her home that day; he told me no, that if I took the child away from there and she came to herself she would scream and couldn't stand the pain. They kept her asleep most of the time. * * * * Q. Was there any further complaint that day as to the bandages or splints? A. Not that day, I think. Q. During that time (the first five days) was the attention of Dr. Phifer or any of the attendants called to the condition of the bandages? A. He came to the door and asked how the arm was—I told him it was paining her awful and to come and loosen the bandages. He said the bandages were not too tight and they had to be tight. * * * * Q. During those five days, were the bandages changed at any time? A. No. Q. You weren't in the room all the time with Myrtle, were you? A. No. Q. Well, how did you know then that the bandages had not been taken off nor the arm inspected? A. I could see where the bandage was soiled and it was always in the same place and always looked the same. Q. Were the bandages loosened or tightened at the time you were away? A. No."

On cross-examination, she testified that the blue and cold condition of the fingers continued for two or three days, that the fingers then began to turn a more natural color and became more puffy. That the hand remained cold, but the fingers began to look white, commencing about the 4th day. She was then asked if it was not true

that on Monday, the 4th day of July, the bandage was taken entirely off of the child's arm. She answered: "It was not." We quote a few of the next succeeding questions and answers:

"Q. You think that couldn't have happened without your seeing it? A. It did not. Q. Why do you say that so positively. · A. Because .I always looked at it particularly to see if it looked the same, to see if they had done anything, but soiled parts were always there, not moved. Q. Where did the soiled marks come from? A. From rubbing it around over the bed, and one thing and another. Q. Was your attention drawn to the fact that these bandages had been changed any time Monday? A. No, it wasn't. I know it hadn't been changed. Q. You examined it inside and out, upside down—? A. Oh, I examined it enough so that I know. Q. And you feel able to say from looking at it lying on the bed that it was impossible that that bandage could have been changed on Monday? A. Yes, sir. Q. When was it you first noticed that the fingers began to resume their natural appearance? A. The third or fourth day they looked white. Q. Was it very remarkable or striking difference in color, or very slight difference? A. Well, it wasn't near so blue, it looked more natural. Q. So much so as would make you believe that the pressure was removed and the arm getting better? A. I didn't think anything about the pressure being removed . I just thought that the fingers looked a better color. Q. Then it was on Monday and Tuesday that you spoke to the doctor about the bandages being tight? A. Yes, sir. The doctor came to the door and asked how the arm was and I told him to come and loosen them. He said No, that it wasn't too tight and it had to be tight. Q. Did he look at it? A. No. Q. When you called the nurse's attention to it, did she look at it? A. No. * * * The first five minutes after she came out of the dressing room, and Mr. Baker called attention of the nurse, she stepped up

and felt of the fingers and said it wasn't too tight. Q. And you stopped protesting about it, didn't call attention to it again. A. Oh, I don't know as I did. I didn't get to' see the doctor every time, and I would wait, and have to go to breakfast, and while I was gone he would come in. So I guess that is about the only time I told him to loosen it. Q. Now it was Thursday that you say you asked Phifer if you could take the child home? A. It was on Thursday Dr. Phifer stopped at the door an said, 'You folks can go home.' Q. He gave you no instructions about treating the arm? A. No. He told us to bring her back in four or five days. We brought her back the fourth day. We were so anxious to see the splints off we didn't wait till the fifth day.''

About the removal of the bandages on the 10th day, she said that the arm was just as flat as it could be, ''it was white, a greenish white, and looked to be scalded, sores all up and down, upon the thumb and on the back of the hand, and when they took the splints off part of the skin came off or broken open, and bloody water dropped off;'' that the defendant washed the arm with alcohol and put on some salve, which treatment was continued for some six or eight weeks, changing the salve and the wash once in a while. ''Q. No incision was made? A. Not until we took her there the last two weeks. Phifer wanted us to leave her there and we left her there the 5th day of September. Q. And that was the occasion that there was a change made in the treatment? A. That was the time he cleaned the sore out. I was not there. We left the child there and went home and the next day when we came back we found her in bed.''

She testified also that after the bandages were taken off, Dr. Holtz, the assistant of Dr. Phifer, treated the arm several weeks for the purpose of curing the sores, and that except at one time when they went to Fort Collins by Dr. Phifer's consent on a visit, the child was taken for treatment to the hospital every day or every few days

according to instructions, the intervals varying from time to time; during which period the arm gradually drooped until taking the position in which it was finally left; that the child was at one time furnished with a bag of sand or gravel to carry around with her injured hand; and on one occasion when the drooping was noticed by Dr. Phifer he said: "This won't do, Holtz, we will have to put her to sleep and straighten it." That at the conclusion of the last two weeks period above mentioned, the child was taken to Dr. Lowe at Sunrise, a physician employed there by the Colorado Fuel & Iron Company, and who was also one of the expert witnesses in this case for the plaintiff.

Dr. Lowe testified that the plaintiff was brought to him for examination on September 20, 1921, at which time he removed the bandage, inspected the arm, and found the same disformity as at the time of the trial, and also this condition: That the anterior surface at an indicated place was spreading a slight discharge of pus and there was also at an indicated point a superficial area of suppuration. That there was a depression, with a small piece of gauze as a drainage, at another indicated place. That on the back part of the arm was a small ulcer; that the posterior surface of the arm was healed over old scar tissue, with the exception that on the upper part there was a small ulcer. He then testified that the surface of the arm was entirely healed on October 12, 1921, when his care of the plaintiff ceased; that the deformed condition of the arm simulated Volkman's Paralysis, sometimes called Volkman's Contracture. That there was a possibility that the arm might be extended by operation, although he could not give a "very good prognosis as to good results" at that time, and that about the only result of a successful operation would be a straightening of the arm to a normal position, possibly with some ability to use it, but not like normal, without, however, restoring the wasted condition of the muscles or the strength of the arm to that of the other.

A hypothetical question was then propounded to him, assuming as facts the accident, described as a "simple fracture of the ulna of the left forearm at a point approximately two inches below the elbow joint," the setting of the arm within two hours thereafter, the placing at that time of splints upon both the front and back of the arm, fixed in place with tight bandages, pronounced discoloration of the fingers, with marked swelling, the hand turning cold, within thirty minutes thereafter; that although the attention of the surgeon was called thereto the bandages were not loosened nor removed for the purpose of examination, until July 10, 1921. And the witness was thereby asked to state whether he was able to express an opinion as to whether or not the attending physician employed the ordinary skill, care and knowledge possessed and employed in like cases by the average of the surgical profession in Wheatland and towns of like location. Having answered that question "yes," the following were then added to the assumed facts: That when the bandages were removed on July 10, a portion of the skin under each splint came away with the pads, accompanied by a discharge or flow of bloody water; that the arm was flattened; and that the flesh had a greenish-white appearance, and resembled an arm that had been scalded, and he was asked if he was able to give an opinion as to the probable cause of the condition of the arm so described. Following an affirmative answer, and replying to a question asking for his opinion, he said: "Pressure, and necrosis or death," and stated his opinion as to the probable cause of the necrosis, impairment of the circulation caused by "tension or swelling interfering with the circulation, probably induced by the too tight bandages." He testified further that said result should have been reasonably anticipated and foreseen by a doctor possessing and exercising the ordinary skill, care and knowledge possessed and employed by the average of the profession in said town and other towns of like situation; that to re-establish

circulation all bandages with splints should be removed and a stimulation of some kind used; that upon the conditions arising as stated in the hypothetical question the attending surgeon should have removed the bandages and inspected the arm, the treatment then to be followed to be "expectant upon what he found," and that the deformity of the arm was permanent.

Dr. Ben N. Ladoit Johnson, of Casper, was plaintiff's other expert witness. After stating his qualifications in responding to questions for that purpose, and, among other things, that he had been an instructor in surgery in the Chicago College of Medicine and Surgery and in the Chicago Hospital College, and having replied affirmatively to a question whether he had made an examination of the plaintiff in the case, he was asked to examine the injured arm and point out its condition at that time. He said: On the front surface there is an irregular scar extending from about three inches below the elbow joint down the arm on the inside to the last phalanx of the thumb, and extending down deep into the structures. There is a loss of the fibres of the flexor muscles, extending a trifle above the union of the middle and upper third. On the inside of the thumb adductor group has been wasted away considerably; and on the posterior or lower surface of the arm is an irregular scar extending from about two inches below the point of the elbow downward and across over the bone on the outer side of the arm to the lower portion of the wrist bone, which scar is slightly adherent. The flexor muscles and tendons on the inside of the arm are shortened, so that the wrist is at an angle of about 135° to the forearm. The fingers are contracted. There is some motion in the wrist joint and in all of the joints of the fingers. The fingers are contracted markedly. The thumb has no power to be drawn inward. That condition he stated is what is commonly known as a Volkman's Contraction, which he believed was sometimes spoken of as Volkman's Paralysis.

The plaintiff's hypothetical questions aforesaid were then propounded to him, asking for his opinion as to the skill employed by the attending surgeon. He answered: "He should have removed the bandages and made an inspection. * * * * He didn't follow the ordinary rules, the regular rules that are ordinarily followed in that class of cases." Asked as to the probable cause of the results, he replied: There was too great a pressure, shutting off the circulation in the arm. * * * * The circulation was cut off by pressure, and the death of structure en masse occurred on account of cutting off the circulation; —that being caused by too much pressure. Then asked "Caused by what?" he answered: "Well, a hemmorhage or odema in the structures—odema or pressure in the structures—not opportunity enough for the structures to expand to accommodate the circulation." "Q. And what, assuming the facts in the hypothetical questions to be true, would you say prevented these things from expanding? A. The type of bandage used." Asked whether the conséquences should have been reasonably anticipated by a doctor exercising ordinary care and skill, he answered: He should have inspected—on the symptoms that arose in the hypothetical question, he should have removed the bandages and inspected the arm. The treatment following that would be expectant on what he found. He also testified that the resulting condition of the arm was permanent.

It is argued here by counsel for plaintiff in error that whether the bandages should have been removed on complaint of the patient or her parents that they were too tight was a matter to be determined by the attending surgeon according to his best judgment, in the reasonable exercise of which he would not be responsible as for negligence, and the testimony of Dr. Lowe and Dr. Johnson on cross-examination is relied on to some extent in support of that argument. It seems proper, therefore, to refer

briefly to that testimony, taking up, first, the cross-examination of Dr. Lowe.

Q. Would a complaint by a patient, friend or relative, that such bandage was too tight, require more than an inspection of the fingers and the placing of the hand on the back thereof and under the bandage to determine whether or not the same was too tight? A. In my treatment, it would simply call my attention to the fact that it should be looked at. Q. From such an inspection and examination, could you determine whether the bandage was too tight? A. I could not.    Q. Then in a case of your own, if the patient or relative thought the bandage was too tight you would feel unable to determine the matter without taking off the bandage and inspecting the arm? A. That depends on the condition and what my judgment would be as to what the condition was at that time. If I had put it up and it was in a certain condition, and the length of time that had gone on, and I didn't think it was sufficient to remove it, I probably would not remove it. Q. Then you would rely on your own professional judgment, knowing what you had done, and seeing what you were able to observe and feel without undoing the bandage? A. If my attention was called to an injury I would probably look at it to see, and then determine what I would do. Q. And from that inspection and feeling of the fingers and hand, you would be able to determine whether you ought to remove the bandage or not? A. I think I would. Q. That is in accordance with the usual practice? A. I think so. Q. But if on such inspection and examination you conclude it was not necessary to remove the bandage, you would not do so? A. I would not.

Cross-examination of Dr. Johnson. Q. Is it not true that an ordinary physician and surgeon, having had experience in cases of this kind, could by visual inspection of the fingers and hand, and feeling of them, and putting his hand under the splints, determine whether or not it was

necessary to remove the bandages? A. He should be able to. Q. And you act on your judgment in such a case as to whether it is necessary to remove the bandage? A. Yes. Q. Would you rely upon the judgment of the patient or relative of the patient or upon your own judgment as to such a matter? A. As a general proposition, on my own judgment. Q. You would not consider yourself negligent if you failed to remove the bandage after such an inspection? A. That would be questionable. As a rule if the patient even felt a dressing or a bandage or a splint or a cast or what not—that is the doctor himself is unable to tell just what that patient feels—as a rule I go after it and find out whether he is right or wrong. Q. Suppose that a suggestion comes not from the patient but from a friend or relative, would you consider that the latter was better able than you to judge of the necessity to remove the bandage? A. As a general rule I would not. Q. Are there not some objections to taking off a bandage freshly put on a broken arm? A. Yes. Q. And wisdom and experience would dictate that it be left on unless the necessity for taking it off is apparent? A. Yes. Q. Taking it off upon light or insufficient reason might complicate the condition and entail serious consequences? A. That is possible. On further cross-examination, he stated that there were other causes besides external pressure which might interfere with circulation, such as the destruction of the blood vessels from either thrombosis, embolism, or a destruction of the nerve supply controlling the arm, as by severing of the nerve trunk, or by putting sufficient pressure upon it to render it unable to function; or that it might result from the severance of a vein or an artery. But on re-direct, he testified that in the exercise of ordinary care, skill and diligence, a doctor should be able to detect the severance of an artery; that the signs thereof are—the limb beyond the severance becomes ischimic, or turns white, the structure, if there was sufficient collateral

circulation, would begin to swell and become blue, and as that disappeared, gangrene would set in, it would become white again, and the swelling would gradually disappear; and that if the artery was of sufficient magnitude, so that the surgeon could touch it with his fingers, he should know the condition practically immediately, and under ordinary circumstances, within the next twenty-four hours; though in case of a complete severance, the surgeon should be able to detect that immediately. Then, having described the position of the hand and fingers in the case of a "typical" Volkman's Contraction, he stated that evidences of it appear, as a rule, within forty-eight hours, and testified that he would consider plaintiff's condition a typical case of Volkman's Contraction, possibly slightly aggravated.

The testimony of these expert witnesses, in our opinion, tends to support the averments of the petition that the condition of the plaintiff's arm was the result of too tight bandages and the failure to remove the same and inspect the arm at the proper time to have avoided the condition leading to the deformity. And, so far as the evidence introduced by the plaintiff in chief is concerned, we think it sufficient to have taken the case to the jury and therefore, that the court did not err in refusing at the close thereof to direct a verdict in defendant's favor. The ordinary rules controlling the action of the court in directing or declining to direct a verdict in cases of this kind are stated and considered at some length in Wright v. Conway, 241 Pac. 369, 242 Pac. 1108, and the direction of a verdict at the close of the plaintiff's evidence was sustained in that case. We have in mind the same rules here, and do not recede from anything said in our opinion in that case concerning the duty of the court to avoid submitting such a case to the jury where there is not competent evidence upon which to base a verdict for the plaintiff, or where such a verdict could only be the result of guess or conjec-

ture, or some standard of liability of the jury's own creation.

We are not unfamiliar with the rule stated and the cases cited in the brief of plaintiff in error, respecting the right of a physician or surgeon to use his best judgment when pursuing the customary treatment in a careful and skillful manner, as to matters necessarily depending upon his judgment at the time, and have recently had occasion to examine several of the cases  cited with reference to that matter in considering and disposing of the case of Wright v. Conway, supra.  But we think it was not the duty or province of the court at the close of the plaintiff's evidence to determine whether the manner of adjusting the splints and bandage and the alleged failure to remove the same was or was not the result of mere error of judgment on the part of the defendant for which he would not be responsible.  Error of judgment may be so great as to be inconsistent with reasonable and ordinary care and skill, and the rule may be expressed thus, that there is no liability for mere error of judgment if there has been a careful examination and ordinary care and skill is exercised.  We think the testimony of plaintiff's said expert witnesses furnished a fair basis for the jury's consideration in ariving at a conclusion upon the disputed question of negligence, and that the same is not to be regarded as having the effect solely of explaining what either of said witnesses would have done, following his own inclination or judgment.

The defendant, testifying in his own behalf, after stating the facts of his professional education and experience, described his care and treatment of the plaintiff substantially as follows:  Upon being informed that plaintiff had an injured arm, she was taken to the X-ray room of his hospital, where the arm was examined by feeling of and looking at it, then with the fluoroscope, followed later by an X-ray picture, whereupon he diagnosed the injury as a double compound fracture (both bones of forearm bro-

ken),and a small opening in the skin just below the elbow in the neighborhood of the fracture; "the sharp spicules of bone had broken through the soft parts and the skin," but without visible bleeding. That both bones were broken at about the junction of the upper and middle third of the forearm; the injury to the upper bone might properly be termed a greenstick fracture. That the arm was somewhat swollen, with a marked bowing inward, and the X-ray showed the under bone, the ulna, broken completely in two, and the upper, the radius, almost completely in two, holding by a mere thin layer, as if it was the covering of the bone on the outside. That the plaintiff was then taken to the dressing room, given an anaesthetic by the surgical nurse, Miss McDonald, and the fracture reduced and put up in splints, which he had made while the anaesthetic was being given, the arm having been first washed thoroughly with benzine, then wrapped in sterile gauze, fitting the splints first to the well arm, and then made the proper length with a beveled place cut out for the thumb. The arm was covered with gauze, extra cotton applied over all of the bony prominences and in the palm of the hand and above and below the fracture, the splints being already padded with cotton. The splints were put on, one in front and one underneath, "what is known as an anterior and a posterior splint," some strips of tape put around to hold them in position, each finger and thumb examined, the hand slipped under to see that the splints were not too tight, "the splints taken in my own hand to see if there was plenty of spring to them." They were made and adjusted to the arm,—wider than the forearm so that they would not press the bones together but simply hold them straight and parallel. The tape was put around the splints to hold them in position. The gauze bandage was started at the fingers and brought on up the arm in spiral fashion until the elbow was reached, or the end of the splints, and the arm was thoroughly tested out to see that the circulation was good, and that there was no

undue swelling or pressure.  As to the necessity for that
he said:  The adjustment of the splints and bandage at
the right pressure is important so that the reduced frac-
ture may be properly held in place.  If too loose the frac-
ture will come out of place, leaving the original deform-
ity.

The X-ray picture—the film, was then identified by him
and introduced in evidence.  He explained, however, that
the arm was partly straightened at the time, since the
nurse held the hand and forearm to keep it still while
making the exposure.  Thereupon, there was brought out
upon the defendant's direct examination what is perhaps
the most material conflict in the evidence.  He testified
that after the operation aforesaid the child was put to
bed, and he saw her in an hour possibly, and watched her
closely to see how she was coming out from the anaes-
thetic and how the arm was resting, examined each finger
and the thumb separately to see if they were swelling or
discolored.  That upon pressing the finger it turned white,
and letting it loose it turned pink, showing thus the blood
was reaching the end of that finger; that being the ordin-
ary test in such cases.  That he saw her again that night
about 9 or 10 o'clock, finding the same condition; she then
being awake and resting.  That he saw her the next day,
morning and evening, making the same usual tests and ex-
amination, finding that the hand was not unduly swollen
or discolored; and no complaint of an unusual amount of
pain.  That he saw her again the next morning (Monday)
about 8.30, making the usual observation, and then, at
about 10 o'clock that morning took her again to the dress-
ing room and changed all of the bandages.

Q.  You mean that you took off the bandage that was
on the arm?  A.  Yes.  Q.  And put on a bandage?  A.
We bandaged the arm.  Q.  How did you put on the new
bandage?  A.  Took off the bandage, cutting the adhesive
strips, sponged off the arm, and put it back by putting
our sterile gauze and our cotton pads and our splints on in

the same way that they had been put on at the first dress-
ing. Q. What was the condition of the arm when you
took off the dressing? A. Slightly swollen, slightly dis-
colored and blue, and not in any way different from what
we would expect. The circulation was good. There was a
slight discoloration of the thumb. It looked like an in-
jury,—a bruise. Q. What, if anything, did the splints
have to do with the discoloration of the thumb? A. Prac-
tically none. Q. What was the cause of the discolora-
tion? The original injury. That he saw her again that
evening, and examined the fingers, thumb and bandages,
finding the fingers pink and not unduly swollen, and again
the following day, night and morning, making a like ex-
amination, finding no different condition either time.

Q. How long did the child remain in bed? A. I don't
know. She was permitted to be up after the second or
third day in a wheel chair. Q. Did you make any examin-
ation of the arm and hand on the 4th or 5th days? A.
She was examined every day, the splints to see if they
were too tight, or if there was any undue amount of swell-
ing, or if the fingers were of the proper color, and the
conditions were just what they should be, circulation
good. Q. What, if anything, happened on the 5th day?
A. The child was visited as usual in the morning. She
was not there in the late part of the afternoon. The
mother informed me that day that she was going to take
the child home. I insisted that she should not. She said
she could take care of her just as well at home as we were
taking care of her. I said "Mrs. Baker, you cannot take
the child out of the hospital and hold me responsible for
the result." When I made my rounds the next morning
the child was missing. On Sunday, the 10th of July, she
was brought back into the office. The mother paid the
balance due on her bill, and I remonstrated with her for
taking the child out. She said the child was getting along
all right and doing just as well as it was doing there. I
told her that might be, but that she couldn't be the judge

—she didn't know whether it was doing well or not—
many things might happen to the child. I repeated again
that I would not be responsible if she persisted in keeping
the child at home, and requested her to leave it that day
again. She took the child away. Q. Did you make an
inspection of the arm at that time? A. Yes. Q. What
condition did you find? A. I found the hand in good con-
dition. Q. When did you next see her? A. As well as
I remember, it was the 14th. She brought the child back
to the hospital. We took the bandages off, and made our
inspection. Q. What condition did you find? A. We
found the fingers pink, the arm somewhat discolored, but
not unduly swollen, but no occasion for any change in our
treatment. Q. When did you next see her? A. On the
17th. The arm was looked at in the same way. The fin-
gers tested out and thumb. The bandages removed. We
found the arm in fairly good condition, but the bandages
had apparently been tampered with. The mother said she
had changed them, and that she was as able to do it as any
of the nurses. She was again warned against interfering
in any way if she expected us to be responsible. He con-
tinued: Around the site of the injury the arm was red
and showed every evidence of inflammation in the area
of the fracture, where the break in the skin was in the
first place. It was more swollen than usual and he ex-
plained to the mother that there was evidence there of a
beginning inflammation, and that the child should by all
means be left in their care, but she took the child away as
usual, after clean bandages were applied, gauze and dress-
ing, the original splints having been taken off, the anterior
splint gone, the posterior splint still there. Q. Did I un-
derstand that you restored both splints? A. No. There
was an inflammatory condition there, and we only put the
posterior splint on, and dressing. On the 31st we un-
bandaged the arm, and on account of the infection which
had developed, the inflammatory condition, and a possibil-
ity of pus, we obtained the mother's permission to open

the arm. Gave the child an anaesthetic and with sterile instruments excised the arm down the front, obtaining probably two or three tablespoonsfull of pus. The whole arm was full of pus. We washed it out with Dakin's solution and put in gauze drainage. The mother again refused to leave the child, but she brought her back every day for a certain period after that. Respecting the subsequent treatment, he testified that until the latter part of the month (August) when the visits became less frequent, the arm was thoroughly cleansed upon daily visits and the gauze removed to keep the incision opened, and a certain amount of manipulation done, massaging of the fingers and wrist. Some days she returned more than once, and Dr. Holtz saw the arm under his supervision. That the first indication of the shortening of the tendons or deformity appeared on the 24th. That on account of the inflammatory condition they were unable to put the splints back, and the droop became more pronounced.

Miss McDonald, who had been the surgical nurse, but at the time of the trial was living at Delta, Colorado, described the first treatment of the plaintiff substantially the same as the defendant, including the tests made to see that the splints and bandage were not adjusted too tightly, stating also that "there was a slight spring, not a great deal, of course, but just a slight spring  *  *  * The fingers were normal color and pink, and the circulation was found to be good." She corroborated the defendant also as to the change of the bandages on Monday morning, July 4, the second day after the first treatment. She testified that he removed the soiled bandage, cut the adhesive strips, turning back the splints, "the upper splint while I held the lower splint in place," removed the cotton and gauze, washed the arm with either benzine or alcohol and then sterile dressings were applied and the arm rebandaged as in the beginning. That the fingers and hand, after that operation, were a good color, an in-

dicated part of the hand very slightly swollen. That the
color of the arm was good excepting a slight discoloration
"where the skin was broken." That the child was back
during the month of July several times, the first she saw
of her after the change in the bandage being on July 14th;
that she also saw her on the 24th, and that on the 31st an-
other operation was performed, which she described as
follows: Two incisions were made, one above and one
below this place where the skin was broken, and this old
place where the skin was broken was reopened and the
pus drained from nearly the whole length of all three
openings; all being irrigated with Dakin's solution, and
a small gauze drain through there. That a large amount
of pus was found, a great quantity for such a small area,
and after it was thoroughly cleaned out, "these drains
were inserted." That the arm was then bandaged, but
the upper splint left off. That the arm after that was
dressed sometimes two or three times every day, though
she did not see it every time, and the same kind of treat-
ment given as before, but after a few times the skin be-
came tender, and an ointment, some days a scarlet oint-
ment, and some days zinc oxide ointment, was used. That
she saw the child through the month of August, until
about the 26th, and then not until September 5, when she
came in for dressing, and remained there about ten days
while the arm was being treated. That early in August
the fingers showed a tendency to turn up, at which time
the arm was soaked and massaged or manpulated, and an
effort made to straighten the hand, that she was given a
pail of sand to carry around, and the good hand was band-
aged up so that she would make more of an effort to use
these fingers. That the mother was there part of the time
and present at some of the dressings. She also corrobor-
ated the defendant in his statement that he had from the
first advised Mrs. Baker to leave the child in the hospital
where it could receive better care. Other nurses also cor-
roborated the defendant as to that matter, and testified

also to examining the fingers the first four or five days and finding the circulation good.

The defendant introduced three expert witnesses, each of whom was asked to explain the causes of Volkman's Contracture and then examined by propounding hypothetical questions based upon the facts of the diagnosis and treatment shown by defendant's testimony, which may be illustrated principally by reference to the testimony of Dr. Buchtel, of Denver, who, describing his education and experience, said that he had specialized in surgery. He described Volkman's Contracture as a deformity in the wrist and fingers and forearm, caused by the destruction of the muscle cells having the property of contraction, and said that the most frequent cause is a tight bandage; that the next most frequent cause is pressure from an effusion of blood in the deep tissues, and a third cause is a blocking of one of the arteries of the arm. Asked if infection was ever the cause, he replied: "I never saw infection the cause * * * I have seen a flexicon deformity that looked like a Volkman's Contraction, with fracture and without fracture," * * * "if one has an infection in the deep structures of the forearm, one may have a destruction of tendon sheaths, and a certain amount of destruction of these muscles that would give a contraction deformity which would appear like a Volkman's Contraction." He described also the ordinary treatment of a fracture of the forearm as comprising—first, a reduction of the fracture and holding it in position with properly applied splints, * * * wooden splints being used by most physicians, perhaps, padded so as to provide for any swelling that occurs, and a roller bandage over the splints to hold them in contact with the arm. That the customary and approved method of testing to determine whether a splint has been applied too tightly or not is by inspection and palpation; palpation to feel the temperature of the hand, pressure on the fingers to see if the blood returns after pushing it out, and after

dressings are on, and one feels the pulsation to be sure that there is a regular pulse.

Defendant's hypothetical question assumed as facts a complete fracture of ulna and radius, the fracture reduced, the arm put up in ·splints, inspected two ·or three times on the following morning and afternoon, the following day morning and evening, and the two days following that morning and evening, and upon examination, testing the fingers, observing the hand, and on the second day the first splints taken off and re-applied, on July 10 the arm and hand again examined, and on the 14th rebandaged, examined on the 17th, and on the 24th the bandages removed, up until which time there was no appearance of anything to resemble a Volkman's Contracture, but after that, on July 24, an infection developed and on the 31st an incision made to relieve the pus, when a condition resembling Volkman's Contracture developed; closing with a question as to the cause of that condition.

Dr. Buchtel's answer was, "Infection, by which I mean suppuration in the deep structures of the forearm." He also testified that a Volkman's Contracture due to tight bandages would put in its appearance within the first forty-eight hours, and that blisters on an arm are not uncommon in fractures, and that it is not necessary to have splints on an arm for blisters to appear. Also that pus may be developed in an arm without a compound fracture, which he explained by stating that there might be a collection of blood from the ends of a bone forming a clot in the deep structures of the arm, which must be either absorbed or drained and may become so infected as to be changed to pus.

Upon cross-examination, plaintiff's hypothetical question was propounded to him, and he answered as to the probable cause of the condition of the arm upon facts therein stated,—"Too tight dressing."

Dr. Delehanty, of Denver, another expert witness for the defendant, testified that Volkman's Contracture or

Paralysis may come from pressure exerted from the outside, or infection on the inside; that the condition usually shows within forty-eight hours, "the pathological changes are going on from the beginning, but the evidence would probably not be manifested for some forty-eight or thirty-six hours;" that it might come from an infection caused by a severe bruise raising a hemorrhage inside, forming a tumor, which, however, may be absorbed without any particular destruction. That it may be infection from the outside from a skin perforation, or from germs circulating in the blood. Then responding to the defendant's hypothetical question, he said that the only explanation he could see for the condition upon the facts stated would be infection of the muscles through the wound made there previously, "the particular source would be the wound in the arm,—if there were an open wound there." On Cross-examination, he stated that Volkman's Contracture was usually due to tight bandages, or to plaster casts, or something of that character; and then, answering plaintiff's hypothetical question, he stated that the probabilities were, he would regard it as a case of Volkman's Paralysis due to pressure of the tight bandages "if such were the facts."

Dr. Storey, of Douglas, defendant's last expert witness, testified first as to the usual and customary method of treating an arm for a simple, as well as a compound, fracture by the application of splints, but that part of his testimony we need not go into here except to say that it tended to show a correct practice on the part of the defendant, as explained by the latter in his testimony, and that there might be a compound fracture without visible bleeding. Also, that it was usual for blisters to appear following the application of splints to a fractured forearm, which would usually signify merely what physicians would term a "tropic disturbance." Being asked to state whether, in his opinion, following the application of splints in such a case, and the ordinary and usual tests indicating that the splints were not too tight, a Volkman's Contrac-

ture might result from the splint or the pressure thereof, he testified that it might, since there might be an obstruction to the blood vessel at a certain point, which he explained by the use of a diagram, developing from a destruction of muscle tissues, notwithstanding that all usual tests would fail to show the existence of undue pressure, —such a condition, under such circumstances, being a difficult matter to detect. Answering defendant's hypothetical question, he stated that the natural conclusion would be that the condition in the case at bar was the result of an infection with sloughing of the muscles and tendons. He was not cross-examined.

The plaintiff recalled Dr. Lowe and Dr. Johnson in rebuttal for their opinion concerning the X-ray film put in evidence by the defendant. Dr. Lowe stated that there did not appear thereby to have been a comminuted fracture, or one where the bone projected through the skin; that all he observed was that both radius and ulna were fractured, neither being a complete fracture, and though the bones are broken through, they are not separated from each other; that if the bone has been splintered or the main part was protruding through the dark shadow of the soft parts, it would appear in the picture, and it would be more than likely that any spicules of bone protruding through the skin would also be shown. Dr. Johnson testified to the same effect, stating that there was no evidence in the picture of the skin having been perforated; that the ends of the fracture appeared to be together and not separated, and that any "spiculae" of bone sticking up from the region of the fracture would ordinarily appear in an X-ray picture. He testified also that giving the plaintiff a bucket of sand to carry around would not be a proper method of correcting the contracture, and on cross-examination that it was possible that in the course of the ride to the hospital from plaintiff's home after her injury the bones might have been sufficiently displaced at the fracture that a spicule would protrude through the

skin, and be subsequently withdrawn so as to show the situation presented by the picture. But on re-direct he said in that connection that you would have the evidence of the spicule having passed through the skin with a hemorrhage present there, and that in his experience he had not met with a fracture in which the skin was perforated where no hemorrhage was present and he did not see how such a condition would be possible.

Mrs. Baker, also called in rebuttal, testified that Dr. Phifer had not at any time informed her that the splints and dressings had been removed or the arm redressed on July 4. Other testimony brought out by defendant with reference to occurrences during his treatment of the plaintiff, and statements made by Mrs. Baker to other witnesses during that period, may be omitted here, to be mentioned later if necessary, for we deem the evidence above related sufficient to explain our conclusion upon the sufficiency of the evidence and most of the other questions presented.

Exceptions were taken to the instructions given upon the final submission of the cause, and those that are insisted upon here will be considered. But for the purpose of disposing of the objections based upon the alleged insufficiency of the evidence to take the case to the jury, we shall refer to the instructions only so far as they purported to state generally the rules governing the civil liability of physicians and surgeons, for in that respect they seem to be in accord with a recent statement of such rules by this court in Wright v. Conway, supra. We extract the following from several of the instructions:

That the injury to the plaintiff was not evidence of negligence on the part of defendant, but it was necessary for the plaintiff to prove by the evidence of competent experts that her injury was caused by such negligence. That it was defendant's duty to use ordinary skill and care in the treatment of the plaintiff's arm, such a degree of skill and care as is ordinarily possessed and employed by phy-

sicians and surgeons in Wheatland and similar communities. That he was not bound to insure successful treatment or a cure, but only to do what is usually and ordinarily done by such surgeons in like circumstances to effect a cure. That a physician does not impliedly contract that his treatment will be successful, or that ill and serious results may not follow as a direct result of such treatment, but by implication he guarantees that he possesses that reasonable degree of learning and skill possessed by others of his profession and that he will exercise reasonable and ordinary skill in the application of such knowledge to accomplish the purpose for which he is employed. That the burden is on the plaintiff to prove by a preponderance of the evidence that the defendant did not use ordinary skill and that by reason of such want of skill or care the injury complained of resulted. That in considering whether the defendant in his diagnosis, care and treatment, exercised ordinary care and skill, the jury may not set up a standard of their own, but must be guided in that regard solely by the testimony of physicians; and if they are unable to determine from the testimony of physicians what constitutes ordinary care and skill under the circumstances of the case, then there is a failure of proof upon the only standard for their guidance, and the evidence insufficient to warrant any verdict for the plaintiff.

With reference to the situation presented by the conflict in the evidence, the court instructed the jury that the dispute turns primarily upon what defendant did or what he did not do in bandaging the arm and in observing and examining it afterwards; and that it is the duty of the jury to decide that dispute—"that is, to decide, from the evidence, what the defendant did or did not do."

It is not here claimed that the defendant did not possess that reasonable degree of learning, skill and experience ordinarily possessed by others of his profession in the same locality. Indeed, Dr. Lowe, testifying for the plaintiff,

stated that he regarded the defendant generally as a skillful physician and surgeon. The whole case depends upon whether he exercised that skill in his treatment of the plaintiff's arm or was negligent as charged in the petition, and thereby caused the injury upon which the claim for damages is based. As above shown the question of negligence was submitted to the jury upon conflicting evidence, as also, it may now be said, the question of alleged contributory negligence or improper and injurious acts of either of plaintiff's parents during the time that she was under defendant's care.

Having in mind what was said in Wright v. Conway upon the question of submitting a case of this kind to a jury where the sufficiency of the evidence is questioned by a motion for a directed verdict, wherein the action of the trial court in sustaining such a motion at the conclusion of plaintiff's evidence was upheld, we perceive in this case no reasonable ground for denying, or even doubting the propriety of submitting the cause to the jury upon proper instructions. The situation here is entirely different from that in the Conway case. There the evidence was undisputed, and the facts with the expert evidence left the question of alleged negligence and also of causal effect open to mere conjecture. Here, the evidence upon substantially every material fact is in direct conflict, affecting not only the question of negligence, but also the question of the causal connection of the alleged negligent acts with the injury complained of. And there is competent evidence to support the charges of negligence, and that the injury was directly caused thereby. On the other hand, there was also competent evidence, if believed by the jury, to have supported a verdict for the defendant. But the conflict was determined by the jury "upon all the issues," as stated in the verdict, in favor of the plaintiff. And the case was peculiarly one for the jury.

It does not seem necessary to repeat at this point said conflict in the evidence. So far as there may be a conflict as to whether the arm was bandaged too tightly at first, it is, perhaps, not direct, but arises as the effect of the testimony on both sides relating the circumstances, and what was done and observed. But the conflict is direct as to whether the bandage and arm were thereafter examined sufficiently, or whether the bandage was removed and replaced at any time prior to the tenth day after having been put on. The conflict is direct also as to the condition of the arm at that time, and as to the nature of the fracture,—simple or compound,—whether there was an opening in the skin as the immediate result of or connected with the fracture. As to all of these matters the verdict discloses a finding for the plaintiff. We have above cited Priestly v. Stafford, as a case closely in point. Another is Mitchell v. Hindman, 47 Ill. App. 431. s. c. on appeal, 150 Ill. 538. There was a conflict in that case as to whether the bandage had been removed.

Defendant's counsel objected to the hypothetical question propounded to plaintiff's witnesses by her counsel and exceptions were taken to the rulings thereon. And it is here contended that such question, considering the same as originally propounded and the additions thereto during the course of the examination, did not fairly present the essential facts and conditions. It is conceded in the brief that a hypothetical question may embrace only the theory of the party propounding it and be founded entirely on his evidence, but it is argued that unless all the essential facts necessary to an intelligent and dependable opinion are embraced therein, the expert opinion will be of little or no probative value. But a careful consideration of plaintiff's evidence has failed to convince us that any essential fact in the plaintiff's evidence was omitted. The omission from the question of the fact that the alleged tightness of the bandage was called to the attention of the nurse and an examination made by her immediately fol-

lowing the operation, or the fact that when defendant's attention was called to the same matter on the following day he inspected and felt of the hand and examined the splints, cannot, we think, be held to have had the effect of rendering the question unfair and of preventing an intelligent and dependable opinion, nor can such an effect be held to have followed the omission from the question of the fact that before treating the arm the defendant had made a fluoroscopic examination and taken an X-ray picture thereof.

When plaintiff's evidence was introduced, there was no apparent claim that the defendant had been negligent in his diagnosis. Nor can we agree with the contention that the use of the word "pronounced" in describing the discoloration of the fingers and of the word "marked" in describing the swelling, or the use of the word "developed" in referring to the condition of the fingers and hand after the operation, or in stating in said question that the hand "turned" cold. The argument in that respect is that these quoted words were not used in the evidence; that the witnesses did not testify to a *change* in appearance. In counsel's brief the dictionary definitions of the words "pronounced" and "marked" are stated; but we think, as used in the question, those words meant nothing more than what may be found in the ordinary definition of the words. For example: "marked" is said to mean "brought prominently to notice; noticeable; rendered evident; easy to designate or recognize;" "Pronounced"'is said to mean "strongly marked; positive; decided; defined; easily or readily perceived or recognized." We are unable to see in these definitions anything upon which to condemn as misleading the manner in which the swelling and discoloration were described. 22 C. J. p. 710, Sec. 799. Nor do we think that stating that the hand "turned" cold or that a condition described by the witness "developed" are to be construed as necessarily implying anything more than the facts testified to by plain-

tiff's witnesses when describing the condition of the arm, hand and fingers following the setting and bandaging of the arm.

The first instruction given to the jury is excepted to upon the ground that in stating the issues it ignored defendant's denial of any act of negligence. We think the instruction may be technically objectionable in that respect, for, after alleging that the plaintiff was seeking to recover damages for alleged negligence in bandaging her arm and failing to remove said bandages, it states merely that the defendant claims that the injury resulted from the negligence of the plaintiff and her parents rather than the negligence of the defendant. But other instructions very clearly recognized that defendant had denied any act of negligence on his part, and, taking all the instructions together, we see no reason whatever to doubt that the jury clearly understood, from them as well as the evidence, that there was no admission by the defendant of any charge of negligence. The evidence has been referred to sufficiently to disclose that the main issue presented thereby on both sides was whether or not the defendant had exercised the ordinary care and skill required of him in the course of said treatment. The third instruction stated that the question of negligence or want of ordinary care on the part of the defendant was in dispute between the parties and that it was the duty of the jury to decide that dispute from the evidence. Several other instructions, including the fourth and fifth, stated the rules controlling the duty and the civil liability of a physician or surgeon, and in the sixth instruction, stated in substance that if the jury found that the injury to the plaintiff's arm was attributable to the negligence of the defendant, *then* subsequent negligence by any other person would not bar recovery. And by the seventh instruction, the jury were told that the burden is on the plaintiff to prove by a preponderance of the evidence that the defendant did not use ordinary skill and care in bandaging the arm and in his

observations and examination of the condition thereof; and that if the plaintiff has failed to prove those claims by such a preponderance of the evidence, the jury should find for the defendant. There were other instructions also, indicating not only that one of the issues, but the chief issue, in the case was whether or not the defendant had been negligent,through the failure to exercise the ordinary care imposed upon him under the general rules of law aforesaid.

The said instruction is also objected to upon the ground that it omits the alternative issue whether the defendant refused to make an examination to determine the necessity for removing or loosening the bandage. But we think it is not objectionable upon any such ground, for, as above shown, we hold that the petition alleges negligence, not only in failing to remove the bandage, but in negligently bandaging the arm in the first place; and the averments of defendant's refusal to examine the arm was one element only of the charge of refusal to remove the bandage and incidental thereto,—the main charge in that respect being, of course, that the bandage was not removed, after having been originally too tightly applied. The instruction is objected to also on the ground that it mentions the cause of injury as negligence in adjusting the bandage in the first place, which, *counsel claims*, was not charged to have been done negligently, but which *we have* already *held* not to be a correct interpretation of the averments of the petition. We think, therefore, that the instruction cannot be held to have misled or as likely to mislead the jury.

The second instruction is one defining negligence generally as the want of ordinary care, and ordinary care as such care as an ordinarily prudent person would exercise in like circumstances, and should be proportionate to the danger and peril reasonably to be apprehended from a lack of proper prudence. We perceive no reason for the giving of that instruction in a case of this kind. And that

is the ground of the objection. But we do not believe it can be held to have been prejudicial. The attention of the jury would necessarily be directed more closely to a declaration of the rules governing the duty and controlling the civil liability of a physician and surgeon, and we think it very difficult to even imagine that any unfavorable effect could have resulted from this unnecessary instruction.

The fifth instruction is objected to upon the ground that in stating the rule of ordinary care required of physicians and surgeons it did not limit it to such skill and care as is ordinarily possessed by physicians and surgeons in Wheatland and similar communities. But the instruction immediately preceding that, and to which no objection was taken, did expressly state that it was the duty of the defendant to use "such a degree of skill and care as is ordinarily possessed and employed by physicians and surgeons in Wheatland and similar communities." Those words were not repeated in instruction No. 5, but what it did say with reference to ordinary care would necessarily, we think, be understood as the kind of skill and care described in the fourth instruction. We think the instruction should not be considered separate and apart from the fourth instruction, but believe, as indeed the jury were instructed to do, that they considered the instructions as a whole and construed each in the light of and together with the others, especially those intimately connected with it.

The sixth instruction is objected to on the ground that "while doubtless stating correctly a general principle," it is plainly inapplicable to the case at bar. The instruction is: "If you attribute the injury to the arm of plaintiff to the negligence of the defendant, as such negligence is defined in these instructions, then subsequent negligent treatment or care, by any other person, would not be a bar to plaintiff's recovery, but the same may be considered by you in mitigation of damages if such subse-

quent negligence of others aggravated the injury.'' It is argued that the injury may have resulted from one of three causes; negligently refusing to loosen or examine the bandage, traumatic destruction or disturbance of the tendons, destroying the circulation, and infection subsequently contracted through the negligence of the plaintiff or her parents; and that the theory is hardly tenable that any negligence of the defendant and negligence of the plaintiff were concurrent, but that there was a single cause. And therefore it is claimed that the instruction is not applicable to the facts established or claimed by either of the parties, and does not respond to the issues as submitted to the jury. But we think the instruction is not subject to criticism on either of those grounds. The jury evidently failed to find that there was any negligence on the part of the plaintiff or her parents or, at least, any that contributed to the injury. The negligence of the plaintiff's mother, if any, in removing bandages, as disclosed by the defendant's testimony, occurred a considerable time after the acts charged in the petition and disclosed by plaintiff's evidence to have been the negligent cause of the injury, and if applicable at all in the case would fall within the realm of subsequent negligent acts of some person other than the defendant. The negligence of plaintiff's mother, alleged in the defendant's answer, in refusing to leave the plaintiff at the hospital, about which there was considerable evidence on the part of the defendant, is governed by another instruction, the ninth, which declared it to have been the duty of the plaintiff and her parents to conform to the defendant's reasonable instructions and requests in connection with his treatment and care of the arm, and that if they failed in that, ''and particularly if they failed to leave the child in the hospital when requested, and through such failure exposed the arm to injury by infection or otherwise, or deprived it of defendant's care, the defendant is not liable for the consequences.'' And we recall nothing in the evidence refer-

ring to any act of plaintiff or her parents which might be regarded as concurrent with any negligence shown on the part of the defendant as a contributing cause of the injury other than the taking of the plaintiff from the hospital by her mother on or about the fifth day after the initial treatment; and the question as to whether that act was contrary to the instructions or request of the defendant went to the jury upon conflicting evidence. For it very plainly appears from the evidence that if the deformity of plaintiff's arm, constituting the injury complained of, was the result of negligence on the part of the defendant, as charged in the petition, it was caused from his application of too tight bandages in the first place, and his failure to remove the same during the period of the first ten days thereafter. All acts thereafter of plaintiff or her parents, if negligent or against defendant's instructions or request, would seem to have been subsequent rather than concurrent.

The tenth instruction given to the jury, to which exception was also reserved, may be described generally as stating that the law presumes that a child between the ages of seven and fourteen years cannot be guilty of contributory negligence; in order to establish such negligence on the part of a child of that age, the ordinary presumption must be rebutted by evidence and circumstances establishing her maturity and capacity. This was preceded by stating that to entitle an adult person to recover damage for an injury resulting from the fault or negligence of another he must have been free from fault, but that such was not the rule in regard to an infant of tender years. The ground of the objection urged against the instruction is that however proper it might be in a trespass case, it is entirely inapplicable to cases of malpractice. And we are of the opinion that such an instruction ought not to be given in a case of this kind unless, indeed, it should appear that the child was at the time wholly under the charge of the physician charged with the duty of the same care

that would ordinarily rest upon the parents. Even though the child might not be subject to any technical rule of contributory negligence, he or she might nevertheless so act in changing the condition provided by the treatment of the physician or surgeon as to largely or entirely interfere with or destroy any causal connection between the treatment and the injury complained of; as, for example, by removing bandages, weights, or splints, in the case of fractures (see Wright v. Conway, supra), or by exposure or other conduct opposed to the directions or instructions of the physician or surgeon.

And it would seem fairly clear that in such a case no technical rule respecting the capacity of the child to be guilty of contributory negligence would prevent such acts or conduct from being considered in ascertaining legal liability of the accused physician or surgeon, if found to have been without fault with respect thereto. But we think the instruction cannot be held to have been prejudicial in the case at bar. There was only one item of evidence to which it could possibly have referred. One of the witnesses for the defendant, a Mrs. Stoddard, testified that at the time of the accident she lived at Guernsey and across the street from the plaintiff and her parents, that after the plaintiff had been brought home from the hospital the first time, she saw her playing in her yard; that "there was a wagon she was on, and I saw her jump off several times, and I saw her on the fence"—a common wire fence. Also, that the child had her arm bandaged up at the time. But that any injury was done, either by displacement of the bandages, or by use of the arm, or as the result of anything then occurring, is not testified to by that witness or by any other. And we think it clear that nothing in such testimony would have authorized a finding excusing any previous negligence on the part of the defendant in connection with the treatment or bandaging of the arm.

The twelfth and thirteenth instructions related to the question of damages. The twelfth instruction stated that the plaintiff is not limited in her recovery to pecuniary losses as to which there may have been direct proof. That certain of the results of a personal injury, such as complained of, must be left to the discretion of the jury to award reasonable compensation, so far as found to have been sustained by reason of the negligence of the defendant, "being governed at all times by the circumstances of the case and the evidence adduced during the trial; and as to elements of damage which cannot be exactly measured in money it is not necessary that any witnesses should have expressed an opinion as to the amount of such damages, but the jury itself may make such estimate from the facts and circumstances in proof." We see no reasonable objection to that instruction. By the thirteenth instruction the jury were advised that if they found the issues in plaintiff's favor, they will award a reasonable compensation for the injury found to have been sustained by reason of defendant's negligence, taking into consideration any pain and suffering, both physical and mental, suffered by reason of said negligence, and "as she will suffer in the future, if you find that she will so suffer in the future, and such permanent injury and continuing disability as you may find that she has sustained, but exclusive of any pain and suffering caused by the original injury, and exclusive of any aggravation of such injury to said arm caused by the acts of persons other than the defendant." That instruction then concluded as follows:

"In connection with the permanence of her injury, if you find it will be permanent, you may consider as an element of damage, whether or not it is such as to seriously impair her prospects of marriage when she reaches a marriageable age, and if you find that it will, you may include compensation for that; but in any event, the amount so awarded, if any, shall not exceed the amount prayed for in plaintiff's petition, to-wit, $20,000."

Some comment is made in the brief about such reference to the amount of damages prayed for in the petition, but we think that such amount was not referred to in a manner to indicate any view of the court that an amount up to that amount might be sustainable upon the evidence, and we perceive no ground for holding that the instruction was in that particular prejudicial. Indeed, the verdict was for ·only half the amount prayed for, tending somewhat at least to show the absence of any prejudice by the mention of the amount prayed for in the instruction. Nor do we see how any surer, safer or clearer standard might be stated for the fixing of damages for pain and suffering, either physical or mental, or for a disfigurement or deformity that is not subject to any legal measure.

We do not understand from the brief that it is claimed that the plaintiff's diminished chances of marriage resulting from her deformity was improperly included in the instruction. All that seems to be contended about it is that such ground for damages must be pleaded and proved, but just what was meant by "proof" as to such a matter under the circumstances presented in this case is not stated, except by the citation of Hunter v. Stuart, 47 Me. 419, a case wherein the injured plaintiff was a young unmarried female, old enough, we understand, to have contemplated marriage, but without any allegation or showing that marriage by her had been contemplated. The court said that the loss of marriage may be of itself a special ground of action, but it was not alleged in the declaration nor sustained by proof; that the defendant had no notice that damage would be claimed for any such cause, and, therefore, could not be prepared to prove or disprove its existence. The principle stated in the instruction seems to be sustained by the following authorities. 1. Suth. Dam. 3rd and 4th Ed., Sec. 93, 17 C. J. 843, Note 19; Smith v. Pittsburgh & W. Ry. Co., 90. Fed. 783;

The Orriflamme, 3 Sawyer 397; Morin v. Ottawa Elec. R. & P. Co., 18 Ont. Law. Rep. 209.

Exceptions were taken to the refusal of certain instructions requested by the defendant below. But we think the instructions given sufficiently contained the principles involved in such requests.

There remains for disposition, of the points presented by the brief for plaintiff in error, certain objections to the admission and exclusion of testimony, in addition to the objections to plaintiff's hypothetical question, which has already been considered. Without referring specifically to the other objections relating to the admission or exclusion of testimony, we think it sufficient to say that a careful examination thereof has failed to convince us of error in the rulings complained of, if any, sufficient to justify any interference with the verdict.

Finding no prejudicial error in the record, the judgment will be affirmed.

*Affirmed.*

Blume and Kimball, JJ., concur.